# RICHARD D. ABBOTT*

S.J.C. BD-2001-045

S.J.C. Order of Term Suspension entered by Justice Cowin on August 14, 2001.**

## MEMORANDUM OF DECISION

This matter is before me on the information and record of proceedings and the vote and memorandum of the Board of Bar Overseers (board). The matter was initiated by bar counsel's petition for discipline brought before a hearing committee of the board. The petition alleged, among other things, that Richard D. Abbott (respondent) violated S.J.C. Rule 3:07, Canon 1, DR 1-102(A)(4)-(6), as appearing in 382 Mass. 769 (1981),[1] S.J.C. Rule 3:07, Canon 6, DR 6-101(A)(3), as appearing in 382 Mass. 783 (1981),[2] and S.J.C. Rule 3:07, Canon 7, DR 7-101(A)(1)-(3), as appearing in 382 Mass. 784 (1981),[3] by failing to prosecute a cli-

---

* On appeal to the Full Court. *See* 18 Mass. Att'y Disc. R.________2002.

** The complete order of the Court is available by contacting the Clerk of the Supreme Judicial Court for Suffolk County.

[1] DR 1-102(A)(4)-(6) provides, in pertinent part: "A lawyer shall not … (4) [e]ngage in conduct involving dishonesty, fraud, deceit or misrepresentation[;] (5) [e]ngage in conduct that is prejudicial to the administration of justice [;] (6) [e]ngage in any other conduct that adversely reflects on his fitness to practice law."

[2] DR 6-101(A)(3) provides, in pertinent part: "A lawyer shall not … [n]eglect a legal matter entrusted to him."

[3] DR 7-101(A)(1)-(3) provides, in pertinent part: "A lawyer shall not intentionally … (1) [f]ail to seek the lawful objectives of his client through reasonably available means permitted by law and the Disciplinary Rules … [;] (2) [f]ail to carry out a contract of employment entered into with a client for professional services … [;] (3) [p]rejudice or damage his client during the course of the professional relationship … "

ent's appeal, making various misrepresentations concerning the appeal, and obtaining a client's signature on a document under false pretenses.[4] The hearing committee concluded that the respondent had violated these canons and recommended that he be suspended from the practice of law for a period of two and one-half years. The respondent appealed to an appeal panel (panel) of the board.

After oral argument, the panel adopted the hearing committee's findings of fact, conclusions of law and recommendation that the respondent be suspended from the practice of law for two and one-half years. The respondent filed objections to the panel's report.

The board adopted the panel's report and filed an information with the county court pursuant to S.J.C. Rule 4:01, § 8(4), as appearing in 425 Mass. 1309 (1997), recommending that the respondent be suspended from the practice of law for thirty months. The respondent now seeks dismissal.[5]

---

[4] The petition also alleged that the respondent violated S.J.C. Rule 3:07, Canon 2, DR 2-101(A), as amended, 389 Mass. 1106 (1983), by knowingly using a professional letterhead which includes a deceptive statement or claim and S.J.C. Rule 3:07, Canon 6, DR 6-102(A), as appearing in 382 Mass. 783 (1981), by attempting to limit his liability to his client for malpractice. However, the hearing committee rejected these allegations and bar counsel did not appeal its conclusions.

[5] In his appeal from the hearing committee's report, the respondent did not challenge the appropriateness of the committee's recommended sanction. As a result, the panel noted that [a]side from the respondent's objections to the findings of fact, neither party has appealed from the sanction recommended by the committee." In his objections to the panel's report, the respondent stated that he did not "directly appeal the sanctions because he felt somewhere down the road the hearing committee's findings will be overturned. But the sanctions are as far-fetched as much of the BBO's theories." The respondent did not brief the issue further in either his objections or in his brief submitted to the county court. Instead, he appears to rely solely on his contention that the petition should be dismissed. Therefore, I need not discuss the appropriateness of the recommended sanction in detail. Cf. Mass. R. A. P.



## I. FACTS

The following facts are drawn from the hearing committee's findings of fact, which were adopted by the panel and the board and supported by evidence in the record.

A. The Respondent Agrees to Represent Atehortua

In 1990, Oscar Atehortua was convicted of cocaine trafficking and sentenced to 15 to 20 years at MCI-Cedar Junction. On October 16, 1990, he filed a notice of appeal from the conviction with the Appeals Court. In March 1991, he retained attorney Jeffrey Denner to handle the appeal, paying him $9,000 to evaluate potential appellate issues and agreeing to pay an additional $9,000 to prosecute the appeal if Denner found any viable issues.

Sometime in the spring of 1991, the respondent was asked by Denner, for whom he occasionally worked as an independent contractor,[6] to review the transcripts of Atehortua's trial for potential appellate issues. From this point forward, the respondent assumed primary responsibility for the handling of Atehortua's appeal.

During the summer of 1991, both the respondent and Denner reviewed Atehortua's trial transcripts and concluded that several non-frivolous appellate issues existed. They decided to file a motion for a new trial. If the motion were successful, they planned to proceed with a new trial. If the motion were unsuccessful, they planned to consolidate an appeal from the denial of the motion with the direct appeal from the conviction.

On August 2, 1991, Atehortua's appeal was entered on the docket of the Appeals Court. Denner filed a notice of

---

16(a)(4), as amended, 367 Mass. 921 (1975) ("[t]he appellate court need not pass upon questions or issues not argued" in appellant's brief).

[6] At the time the respondent became involved in Atehortua's case, he rented office space from Denner. Shortly afterward, he moved to his own offices.

appearance. The respondent later filed his appearance as co-counsel.

B. The Motion for a New Trial

In January, 1992, Atehortua wrote to the respondent, complaining about the pace of the appeal. The respondent replied, stating that he planned to file a motion for a new trial.

In April, 1992, Atehortua again complained about the lack of progress on his case. Some time in the spring of 1992, the respondent informed Denner of Atehortua's complaints. Denner, who wished to withdraw from the case, told the respondent that he could have the $9,000 Atehortua had agreed to pay to prosecute the appeal if he took exclusive control of the case.

On April 22, 1992, the respondent met with Atehortua and told him he was working on the case. A few weeks later, the respondent wrote to Atehortua, on "Denner & Associates" letterhead, stating that the appeal brief would be a "joint product" produced by Denner and himself. The letter purported to be signed by both the respondent and Denner. The hearing committee concluded that the respondent intentionally either forged Denner's signature or caused it to be forged.

On July 29, 1992, the respondent filed a motion for a new trial and a supporting brief. The motion was heard on October 29, 1993. Among other things, the respondent argued that Artehortua's trial counsel was ineffective. However, the respondent did not support the claim with either an affidavit or live testimony from Atehortua's trial counsel. The judge ordered that a further hearing be held at which trial counsel would be present to testify on the issue. No such hearing was ever held. In fact, the hearing committee found that "[t]here is no evidence from the time of the hearing on the motion for a new trial on October 19, 1993 until the Respondent withdrew on April 28, 1998, [that] he

Richard D. Abbott

took any substantial action to advance Mr. Atehortua's post-conviction remedies."

C. The Direct Appeal

Meanwhile, Atehortua's appeal was still pending in the Appeals Court. Denner and the respondent sought a stay of the appeal until the motion for a new trial was decided. On December 8, 1992, the Appeals Court granted the stay, but required counsel to file monthly status reports. The respondent had primary responsibility for filing these reports. However, beginning with the first required report, he often failed to do so. As a result, the Appeals Court issued a total of seven dismissal notices on Atehortua's appeal. Six times, the respondent filed late status reports and successfully moved to vacate the dismissals, reinstate the appeal and continue the stay.

On June 29, 1994, the Appeals Court issued a seventh notice of dismissal. This time, the respondent failed to file a late status report, move to vacate the dismissal and reinstate the appeal or request a further stay. Consequently, on July 29, 1994, Atehortua's appeal was dismissed for lack of prosecution. The respondent did not tell Atehortua about the dismissal. In fact, the respondent had no contact with Atehortua between late 1993, and May, 1995.

The respondent testified before the hearing committee that it had always been his strategy to allow Atehortua's direct appeal to be dismissed, "expand the record" in the course of prosecuting the motion for a new trial, and then appeal the anticipated denial of the motion. However, the hearing committee did not credit this testimony, finding that it was a mere post hoc rationalization for the respondent's neglect of Atehortua's case.

The hearing committee also found that, in an effort to provide evidence of his alleged strategy, the respondent fabricated a letter to Atehortua, dated August 6, 1994, stating in part:

"I have moved to 60 State Street. Jaime's attorney [Jaime was the co-defendant on the cocaine trafficking charge] will be pushing Judge Mulligan on the ruling for a Motion for a New Trial. As you know, our ways are more patient and not as aggressive on our Motion. We are not even filing status reports anymore on the appeal."

In June, 1995, Denner learned that Atehortua's appeal had been dismissed. Denner advised the respondent to file a motion to reinstate the appeal. On June 28, 1995, the respondent filed such a motion. The Appeals Court denied it the next day. The respondent did not tell Atehortua about either the motion or the denial.

D. The Board Investigation

In August, 1995, Atehortua filed a request for investigation with the board. Bar counsel wrote to the respondent, requesting information. The respondent replied, stating that Atehortua's "case is proceeding on a good strategic course." The hearing committee found this statement to be intentionally misleading.

In September, 1995, the respondent wrote a letter to bar counsel's office, reporting that he had recently met with Atehortua and, with the assistance of a translator, they had "a meaningful discussion about his case and the proper strategies to pursue (which, as it turns out, I had been pursuing all along)." He added that Atehortua's "complaint had been taken care of. This makes your further requests on this case moot."[7]

[7] The respondent denies that this statement was, as the hearing committee found, a misrepresentation. He claims that, if bar counsel had timely interviewed or deposed the translator, his testimony would have been "dispositive" on this point. As stated below, bar counsel had no duty to interview the respondent's potential witnesses. See *infra* at 15. Moreover, I must decide this case based on the record before me.



In November, 1995, the respondent again met with Atehortua, this time without a translator. He presented Atehortua with a piece of paper reading: "I, Oscar E. Atehortua, state that I do not want Attorney Richard Abbott to pursue my appeal at this time. I also do not want anyone to see his file concerning me." Atehortua signed the document, but later testified that he did not understand what he was signing. The hearing committee credited his testimony.

Later that month, on November 20, 1995, the respondent met with assistant bar counsel and stated, under oath, that he had written and filed an appellate brief on Atehortua's behalf in August, or September, 1995. When assistant bar counsel confronted him with the Appeals Court's dismissal of the appeal in July, 1994, the respondent stated that it had been part of his strategy to allow the appeal to be dismissed.

Ten days later, on November 30, 1995, the respondent sent bar counsel's office a letter, stating that Atehortua had told him he would withdraw his complaint and that he did not want the respondent to turn his file over to the office of bar counsel. Atehortua later testified that he never told the respondent that he wanted to withdraw his complaint or that the respondent should not turn over his file. Again, the hearing committee credited his testimony.

On December 15, 1995, the respondent retired from the practice of law for three years.[8] In 1996, he wrote to Atehortua, informing him that his case had been inactive and

The record demonstrates that the hearing committee credited Atehortua's testimony as to what happened at the September meeting, not the respondent's. Since the hearing committee is the sole judge of credibility in these matters, I will defer to its finding. See *Matter of Saab*, 406 Mass. 315, 328 (1989) ("Our rules concerning bar discipline … accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing' "), quoting S.J.C. Rule 4:01, § 8(4), as appearing in 425 Mass. 1309 (1997).

[8] In November, 1998, the respondent returned to active status.

asking if he wanted to proceed with the motion for a new trial. He did not tell Atehortua that he was retired and could no longer represent him. In June, 1996, Artehortua began his attempts to have new counsel appointed to represent him in connection with his motion for a new trial. While his motion for appointment of counsel was allowed in August, 1996, new counsel was not appointed until after the respondent filed a motion to withdraw in April, 1998.

## II. DISCUSSION

A. Ethical Violations

The record amply demonstrates that the respondent violated a series of disciplinary rules, including the neglect of a client matter and engaging in conduct "involving dishonesty, fraud, deceit or misrepresentation." DR 1-102(A)(4) and (6); DR 6-101(A)(3). As the hearing committee and the panel found, the respondent neglected Atehortua's case, permitting the direct appeal to be dismissed and failing to push forward the motion for a new trial. When confronted with this neglect, the respondent claimed that this had always been his strategy. To support his claim, he fabricated a letter to his client, forged or caused to be forged another lawyer's signature, made several material misrepresentations to bar counsel and convinced his client to sign a document he did not understand. This behavior constitutes serious misconduct well warranting the thirty-month suspension recommended by the board. See *Matter of Brown*, 12 Mass. Att'y Disc. Rep. 23 (1996) (two-year suspension for neglect compounded by misrepresentations to clients and bar counsel); *Matter of Young*, 11 Mass. Att'y Disc. Rep. 309 (1995) (two- and one-half-year suspension imposed for "inexcusable and callous indifference to the interests of his [criminal] client … and to the inquiries of Bar Counsel").



B. Issues Raised in Respondent's Brief

In arguing for dismissal, the respondent challenges the credibility judgments made and procedure used by the hearing committee. None of these challenges has merit.

1. Witness Credibility

The respondent opens his brief with the statement that "[t]his case hinges on the credibility of the complainant, Oscar Atehortua." I do not disturb the committee's decision to believe Atehortua for the reasons stated in its report. Absent clear error, this court does not disturb credibility findings made by the hearing committee. See *Matter of Saab*, 406 Mass. 315, 328 (1989) ("Our rules concerning bar discipline … accord to the hearing committee the position of 'the sole judge of the credibility of the testimony presented at the hearing' "), quoting S.J.C. Rule 4:01, § 8(4), as appearing in 425 Mass. 1309 (1997); *Matter of Hachey*, 11 Mass. Att'y Discipline Rep. 102, 103 (1995) (hearing committee acts like jury in making credibility finding which may not be rejected unless it can be "said with certainty" that finding was "wholly inconsistent with another finding"); *Matter of Provenzano*, 5 Mass. Att'y Disc. Rep. 300, 304 (1987) (hearing committee's determination of credibility will not be disturbed absent clear error).

The respondent has not presented evidence of clear error. He devotes nine pages of his brief to Atehortua's alleged "lies." Many of these alleged misrepresentations have little or nothing to do with the respondent's various violations of the ethical canons. For example, the respondent claims that Atehortua lied concerning two of the issues supporting his motion for a new trial, misidentification and ineffective assistance of counsel. These alleged misrepresentations are irrelevant to the ethical charges brought against the respondent.

The few arguably relevant examples of Atehortua's alleged deceit—that he lied about his ability to speak English and his knowledge of the respondent's purported strategy

for the case—are essentially an argument that the hearing committee should have credited the respondent's testimony over that of Atehortua based on the respondent's own interpretation of a few vague documents and the "lost" testimony of an interpreter. See *infra* at 15. Such evidence is not sufficient to demonstrate "clear error," requiring reversal of the hearing committee's credibility determination. See, e.g., *Matter of Saab*, *supra* at 328-329 (hearing committee not obligated to credit either respondent's testimony or his "uncontradicted" evidence).

2. Due Process

The respondent makes a series of due process arguments in support of dismissal. While attorneys charged with ethical violations are entitled to due process, *In re Ruffalo*, 390 U.S. 544, 551 (1968), they are not entitled to the full panoply of constitutional protections afforded criminal defendants. *Matter of Eisenhauer*, 426 Mass. 448, 454 ("[b]ar discipline is an 'administrative process under the authority of the justices of the Supreme Judicial Court' ... the special protections afforded a criminal defendant whose liberty is at stake are not applicable"), cert. denied, 524 U.S. 919 (1998), quoting *Matter of Pressman*, 421 Mass. 514, 517 (1995). The respondent was afforded notice and an opportunity to be heard, to present evidence, and to challenge evidence against him, all with the assistance of counsel. He has had the opportunity to appeal the hearing committee's findings to a panel of the board, the board and this court. In short, he has not been deprived of due process. *Id.*

a. Notice

The respondent claims that his due process rights were denied because the petition did not provide him with notice of two of the charges against him: first, that he formulated his alleged strategy of permitting Atehortua's direct appeal to be dismissed only when confronted by bar counsel with his neglect; and second, that he convinced Atehortua to sign a document he did not understand. As for the first



charge, the respondent claims that the petition is "silent" on the subject of when his alleged strategy was formulated. Thus, he claims, he did not receive appropriate notice of the charge and the petition should be dismissed. This argument, however, ignores the fact that the petition specifically alleged that the respondent improperly permitted the direct appeal to be dismissed. Therefore, he was on notice that any and all of the decisions he made regarding the dismissal of the appeal, as well as any statements he made concerning his decision-making process, would be subject to scrutiny.

As for the second charge, the respondent claims that his due process rights were violated because the petition alleged that he had given Atehortua blank piece of paper to sign, not that he convinced Atehortua to sign a written document he did not understand. The respondent's argument splits hairs too finely. The petition provided him with ample notice that the document he submitted to bar counsel, as proof that his client did not want to pursue his appeal, was being challenged. That is all due process requires. See, e.g., *Matter of Saab*, *supra*, at 323-324 (no due process violation when theory of ethical violation changes); *Matter of Looney*, 13 Mass. Att'y Discipline Rep. 445, 465 (1997) (petition pleaded with sufficient particularity where "the basic factual allegations were made known").

b. Bias

The respondent also claims that his due process rights were violated because bar counsel failed to interview a translator present during one of his meetings with Atehortua, thus demonstrating bias and negligence. However, in *Matter of London*, 427 Mass. 477, 482-483 (1998), this court clearly stated that bar counsel has no obligation to interview a respondent's witnesses. The respondent attempts to distinguish *Matter of London* by alleging that assistant bar counsel in the present case was biased, and, inter alia, refused to "discredit" certain of Atehortua's claims.

This is not evidence of bias. Assistant bar counsel is entitled to make judgments concerning witness credibility during the course of her investigation. The respondent simply disagrees with her.[9]

The respondent further seeks to distinguish *Matter of London* by arguing that the translator was not "his" witness because he only knew him for a few hours. While he may not have known the translator for very long, the respondent obviously believed that his testimony would be favorable to him. Indeed, he claims that the testimony would be "dispositive." Thus, the translator was "his" witness and bar counsel was under no obligation to interview him.

c. Admission of Atehortua's Video Deposition

Finally, the respondent claims that his right to confrontation—and, secondarily this right to due process—was violated when the hearing committee admitted Atehortua's video deposition in lieu of his allegedly available live testimony.[10] However, there is no established right to confrontation in a bar discipline proceeding. *Matter of Eisenhauer*, *supra* at 454 (rejecting claims "premised on the theory that criminal procedure applies to bar discipline proceedings"). Moreover, the rules of evidence used in the courts are not applicable to bar discipline proceedings. See Rules of the Board of Bar Overseers, § 3.2 (1985) ("formal proceedings before hearing committees, hearing panels, special hearing officers and the Board shall conform generally to the practice in adjudicatory proceedings under Chapter 30A of the General Laws"); G. L. c. 30A, § 11(2) ("agencies need not observe the rules of evidence observed by the courts … ").

[9] While it is conceivable that there may be circumstances in which refusal to interview a witness may have some bearing on the good faith with which an investigation is conducted, that is clearly not the case here.

[10] At the time of the hearing, Atehortua was serving a prison sentence for his cocaine trafficking conviction.



Indeed, the board's own rules permit the admission of videotaped testimony under the circumstances present here. Rules of the Board of Bar Overseers, § 4.15 (1985) ("At the hearing, any part or all of a deposition … may be used against any party who was present or represented at the taking of the deposition or who had notice thereof"). The respondent and his attorney were present at the deposition and had the opportunity to cross-examine Atehortua. Thus, there was no error in the hearing committee's decision to admit his videotaped testimony.[11]

## III. CONCLUSION

The respondent's neglect of Atehortua's case, combined with his various misrepresentations to his client and to bar counsel, and his fabrication of documentary evidence, demonstrate a " 'persistent and extended pattern of improper and unethical behavior … ' " *Matter of Clooney* 403 Mass. 654, 657 (1998) (citation omitted). It warrants the thirty-month suspension recommended by the board. See *Matter of Brown*, *supra*; *Matter of Young*, *supra*.

A judgment shall enter suspending the respondent from the practice of law for a period of thirty months.

By the Court (Cowin, J.)
Associate Justice

Entered: September 12, 2001

[11] The respondent's remaining argument, that current bar counsel is bound by "admissions" made by prior bar counsel, is meritless. The respondent has failed to demonstrate either that the statements allegedly made were admissions or that current bar counsel is somehow bound by them.

## ORDER DENYING STAY PENDING APPEAL

This matter came before the Court, Cowin, J., on a Motion for Stay of Execution of the Order entered September 12, 2001 pending an appeal to the Supreme Judicial Court for the Commonwealth filed on September 20, 2001 by respondent.

Upon consideration thereof, it is ORDERED that the motion be, and the same is denied.

By the Court (Cowin, J.)
Maura S. Doyle, Clerk

Entered: September 28, 2001



STUART R. ABRAMS
S.J.-2001-M004

## ORDER OF CONTEMPT

This matter came before the Court, Cowin, J., on bar counsel's petition for contempt and the respondent's opposition. After hearing and consideration thereon, it is hereby ORDERED:

1. The respondent, Stuart R. Abrams, is adjudged in contempt of court for violations of the order of January 7, 2001 for his temporary suspension. It is further ORDERED that the respondent shall;
2. deliver his resignation as fiduciary of the Shore estate to the Essex Probate Court and give notice of same to the co-administrator;
3. file and provide notice of his temporary suspension, in the form provided for by the Rules of the Board of Bar Overseers and by certified mail, return receipt requested, to the Essex Probate Court and the beneficiaries of the Shore estate;
4. give required notice to Stella Lento by certified mail, return receipt requested, of his suspension and deliver to her all files, papers, records in his possession, custody or control, whether open or disposed, in any way related to the Lento trust or the respondent's representation to the trust or Ms. Lento;
5. close every IOLTA, client, trust or other fiduciary account if not closed already, including but not limited to the respondent's "client's trust" accounts at North Shore Bank and Eastern Bank;
6. furnish, to the Court and bar counsel, schedules identifying every designated IOLTA, client, trust or other fiduciary account and every other account in